# Richmond

GEORGE R. TAYLOR, ET ALS. v. THE COUNTY BOARD OF ARLINGTON COUNTY, A BODY CORPORATE, ET ALS.

April 25, 1949.

Record No. 3509.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

474

The opinion states the case.

*Clarke, Richard, Backus & Moncure, Oren R. Lewis, Pitt-man & Roberts* and *Angus M. Taylor, Jr.,* for the plaintiffs in error.

*Denman T. Rucker, Lawrence W. Douglas* and *Bankhead T. Davies,* for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

On this appeal the appellants contend that the County Board of Arlington county should have awarded the contract for building a garbage and refuse incinerator to Morse Boulger Destructor Company (herein called Morse Boulger), instead of awarding it to Nichols Engineering and Research Corporation (herein referred to as Nichols).

In 1945 the County Board decided to build an incinerating plant, and in September of that year employed Alexander Potter Associates, widely experienced in that field, as consulting engineers to advise the Board on planning and executing the work. Morris H. Klegerman, a sanitary engineer, was the principal member of that firm and acted for it in performing the duties undertaken by his firm for the County Board. Plans and specifications were prepared and were explained in a letter of December 11, 1945, from Klegerman to Wirt, the sanitary engineer of the county. These plans covered two types of incinerators. One, designated ·Type "A", was a hand-stoked rectangular furnace, and the other, designated Type "B", was a mechanically-stoked cylindrical furnace.

Action on the matter was deferred until in June, 1948, when the project was advertised for bids, according to the plans, specifications and contract documents. Four bids

were received on the hand-stoked type, including one from Morse Boulger, and two were received on the mechanically-stoked type, one from Morse Boulger and one from Nichols. These bids were reported to the County Board on August 28, 1948, and referred to the consulting engineers for study and report. In a letter to the county manager dated September 10, 1948, Klegerman submitted a report and recommendation that the Nichols bid on Type "B" be accepted. The Board met on September 11, 1948, to consider the Klegerman report and took the matter under advisement until September 17. Under date of September 11, Klegerman submitted to the county manager a written memorandum in response to questions raised by the members of the Board at the meeting that day. The matter was again taken up and discussed on September 17. The vice-president of Nichols and the vice-president of Morse Boulger, among others, were heard. The county manager and the sanitary engineer of the county, who had made independent investigations, recommended acceptance of the Nichols bid and it was accepted by the affirmative vote of four of the five members of the Board.

Thereafter, on September 22, 1948, the appellants, who are Morse Boulger and six taxpayers of the county, filed their petition against the County Board, its five members and the county manager, praying that a writ of mandamus be issued to compel the County Board to award the contract to Morse Boulger, and that the defendants be ordered to refrain from executing a contract to Nichols. Nichols was later allowed to intervene as a defendant to the petition.

The petition charged that Morse Boulger, whose bid was $628,843, was the lowest bidder by $17,914; that the Nichols bid had been determined to be lowest by a theoretical method of evaluation that was arbitrary and factually erroneous; that Morse Boulger had been personally invited to bid and had had long and varied experience in building both mechanically and manually-stoked incinerators; that it and Nichols were the only two companies in the United States who build mechanically-stoked incinerators, and that

no valid objection could be made to its experience and capacity to build the proposed mechanically-operated incinerator; that the best interests of Arlington county would be served by awarding the contract to it; and that under the facts stated, and pursuant to section 2725d of the Code and other applicable statutes, it was the duty of the County Board to do so.

The defendants answered the petition, denying that Morse Boulger was the lowest and best bidder, asserting that it was proper to evaluate the bids by comparing operational costs, which had been done; that the Nichols bid was in fact the lowest and best bid and that the best interests of the county required the contract to be awarded to it; that the action of the County Board was taken after careful and impartial investigation of all factors; that it was not a ministerial act but one involving highest discretion; and that there was no allegation or suggestion of fraud or improper motive in their act.

On October 4 the appellants filed an amended petition amplifying their allegations and supplying the charge of fraud, by alleging that the County Board awarded the contract to Nichols, "relying upon the said fraudulent, dishonest, arbitrary and misleading reports of the Alexander Potter Associates, without making the proper investigation, as it was their duty so to do to learn the true facts."

Later, on October 12, they filed a second amended petition alleging that the Nichols bid was materially deficient in meeting the minimum requirements of the plans and specifications.

On these pleadings the evidence was heard *ore tenus* by the trial court, who delivered an opinion filed in the record finding that there was no fraud; that the County Board acted with full knowledge of all material facts; that if competitive bidding was necessary there had been in fact competitive bidding; that the evaluation made of the bids was proper; that the County Board had not acted arbitrarily but in the proper exercise of its discretion pursuant to notice in the proposal for bids; that it was not for the court

to say whether their judgment was sound, as "the interference by one branch of the government with the other, when it is doing what it is supposed to do, ought to be exercised only in the clearest and most pertinent cases, * *. ** I think they did the right thing." The petition for mandamus was accordingly dismissed.

In their seven assignments of error to this ruling the appellants charge, essentially, that: (1) Competitive bidding was required by law and was in fact not had; (2) the evaluation of the bids was illegal; (3) Potter Associates, the consulting engineers, were guilty of actual or constructive fraud; (4) the Nichols bid failed to comply with the specifications, and (5) there was an illegal agreement by Nichols to release some of the work.

1. Appellants rely primarily on section 2725d of the Code (Michie, 1942), as requiring competitive bidding on the proposed installation and refer to various other statutes as establishing a public policy, if not in terms requiring that such contracts may be let only after competitive bidding. Section 2725d is one of four sections added to the Code by Acts, 1932, ch. 358, p. 697, permitting counties to employ or designate county purchasing agents, and the fourth section, 2725f (2725e in the Code), provides that the Act shall not apply to any county until such county purchasing agent is so employed or designated. There is no evidence that Arlington county has employed or designated such agent. Appellees say it has not, and say further that the county manager form of government adopted by Arlington county under Acts, 1930, ch. 167, p. 450, contains no requirement for competitive bidding; and that in fact (and it was so testified by a member of the County Board) this project was being constructed and bonds therefor being issued under sections 1560a et seq. of the Code (Acts, 1926, ch. 161, p. 289, and amendments), pursuant to which Arlington county was created a sanitary district, and under section 1560c thereof its County Board was given the power to contract with any person or corporation to construct a garbage disposal system.

In the absence of some constitutional or statutory requirement therefor, competitive bidding is not ordinarily essential to the validity of contracts for public works, but it is generally considered that the interests of the public are best served by submitting such contracts, if of important size, to competitive bidding. 43 Am. Jur., Public Works and Contracts, section 24, p. 765.

Without deciding whether it was required in this instance, this case should be decided under the rules governing competitive bidding. The evidence shows without dispute that it was the purpose from the beginning of the enterprise to have competitive bidding. Bids were invited, and when received they were dealt with on a competitive basis. In the "Information for Bidders" section of the specifications, it was provided:

"The County Board expressly reserves the right to reject any or all proposals, to waive any informalities or irregularities in the proposals received, and to accept that proposal which in its judgment best serves the interests of the County."

Having invited competitive bids the County Board should not be, and in the development of its case did not ask to be, relieved of the duty, implicit in its invitation, to weigh the bids and make the award fairly and in good faith.

Appellants contend that there was not, and could not be, effectual competitive bidding because the specifications for the stoking mechanism described a unit made and patented by Nichols, without any provision for making that unit available to any other bidder. The evidence establishes that when the specifications were prepared in 1945 Nichols was the only concern making a mechanically-stoked furnace. This was pointed out by Klegerman in his letter of December 11, 1945, above referred to, the advantages and disadvantages of that type furnace discussed, and a plan outlined for receiving bids for Type "A", the hand-stoked furnace, and Type "B", the mechanically-stoked furnace, so as to have competition in Type "A" and also competition between Type "A" and Type "B". That was then the

only competition possible as to Type "B". The description used in the specifications was also the only available description of a mechanical stoker, unless Klegerman could devise a description of one which nobody was making and possibly nobody could make.

The point is made that when the bids were advertised in June, 1948, Morse Boulger was then making a mechanical stoker, but no change was made in the specifications to take that into account. The answer made to that is sufficient. When the bids were advertised the first installation of the Morse Boulger stoker had been in service only since March. The intervening period of three months was not considered enough to give information on performance, or adequate, as Klegerman said, to warrant revising the specifications to permit the use of unproved equipment. "We didn't think that Arlington should be the proving ground."

The county had a clear right to frame its specifications to permit it to buy a mechanically-stoked furnace if it turned out that it would be in the best interests of the county to do so. The fact that the Nichols mechanical stoker was the only one made, and was patented, did not shut the county off from inviting a bid on that type of stoker. The fact that there could be only one bid for that type did not make competition impossible. It could be and was made to compete with the hand-stoked type. The question of the availability of a patented article in competitive bidding has frequently arisen in cases where competitive bidding was a statutory requirement. *Hobart* v. *Detroit*, 17 Mich. 246, 97 Am. Dec. 185 (opinion by Chief Justice Cooley) is often referred to as a leading case in support of the view that such a statute does not prejudice the use of patented articles. "The security of the city," said Judge Cooley, "against combinations and extravagant contracts in such cases must rest in the power which the common council possess to reject any bid which they might regard as unreasonable, * * ." (97 Am. Dec. at p. 187).

Under the contrary view, as said by the Iowa Supreme Court in *Saunders* v. *Iowa City*, 134 Iowa 132, 111 N. W.

529, 9 L. R. A. (N. S.) 392, public bodies might be prevented from availing themselves of new inventions and required to depend upon the cobblestones of our forefathers. The court added that what was meant by the statute there under consideration was that "there must be competition where competition is possible." See Anno., 77 A. L. R. 702, where it is said that the weight of authority appears to sustain the right of municipal authorities to designate a patented or monopolized material to be used for public improvements, if it is not the purpose or the effect of the specification to prevent or restrict the competitive bidding required by statute.

The contention of the appellants on this point would have more force if in fact the Morse Boulger bid was refused consideration on the ground that its stoker mechanism (for which, incidentally, an application for patent was pending), technically failed to comply with the plans and specifications. The evidence is clearly to the contrary. It establishes that the Morse Boulger equipment was considered as substantially complying with the specifications and its bid was in fact received and evaluated along with the Nichols bid, the only other maker of the Type "B" incinerator. The evidence further shows that no complaint was made by Morse Boulger that it could not meet the requirements of the specifications as to the mechanical stoker and no request was made for any change in that regard. In the bid submitted by Morse Boulger it specifically stated it had read the specifications and they were "understood and accepted as sufficient." The specifications resulted in having all the competition that was available on the Type "B" or mechanically-stoked unit.

2. It is next urged by the appellants that the County Board had no right to evaluate the bids; first, because no notice of such action was given, and second, the method used was unwarranted. We think neither of these contentions is sound.

As noted, the specifications specifically reserved to the county the right to reject any or all proposals and to accept the one that in its judgment best served the interests of the

county. Such a reservation is generally held to vest in the authorities a wide discretion as to who is the best as well as the lowest bidder, "and this involves inquiry, investigation, comparison, deliberation, and decision, which are quasi-judicial functions, and, when honestly exercised, may not be reviewed by the courts." 43 Am. Jur., Public Works and Contracts, section 45, p. 788.

The right so reserved is at least as broad as the provision that the bid shall be let to the "lowest and best bidder," made by section 2725d of the Code, by which appellants claim the Morse Boulger bid should be tested.

" * * * The 'lowest' bid may be determined by monetary standards with the dollar as the unit, but this is not so in determining the 'best' bid, or the 'responsible' bid; that question involves a number of other factors and elements." 43 Am. Jur., Public Works and Contracts, section 42, p. 784.

" * * * A decision as to the lowest and best bidder for a supply contract involves a determination of the least expenditure of public funds and a consideration of the quality of the goods proposed to be furnished and the other factors and elements adverted to above." *Idem*, section 42, p. 785.

Clearly among the factors so involved are the experience of the bidder in that field, the quality of his previous work and the cost, not alone of constructing what he proposes to build, but of operating it after it is built. "All else being equal, it is the duty of the public authorities to accept the bid involving the least expenditure of public funds." *Idem*, section 44, p. 787.

When the decision of the authorities is based upon a fair and honest exercise of their discretion, it will not be interfered with by the courts, even if erroneous. Courts do not in such cases substitute their judgment for the judgment of the body to which the decision is confided. Interference by the courts is limited to cases in which the public body has proceeded illegally or acted arbitrarily or fraudulently.

We think that notice that an evaluation would be made came as a necessary inference from the statement that the

bid accepted would have to serve the best interests of the county. The interests of the county lay in obtaining a plant that would do the work at the lowest cost of constructing and operating it. That was clearly the purpose of asking bids on both types of incinerators. If further notice was needed it could be found in the "Guarantees and Tests" provisions of the specifications, one of which was that if the incinerators tested to required capacity, "but shall fail to meet the proposal guarantee for operating cost, (i. e., labor, power and fuel)," the plant would be accepted but the contract price would be reduced, as specified.

Not only so, but the evidence was that it was the common practice to evaluate bids. One of the experts for the appellants so admitted. While he said if notice was not given, he would have no authority to evaluate the bid, yet he would inform his client in that regard as affecting the relative merits of the bids. He agreed that the manpower requirement for operation was a pertinent item, and finally that evaluating bids to determine the best bidder was a sound practice.

In the "Form of Bid" executed by the bidders under a section dealing with labor, the Morse Boulger bid set out the minimum number of men required for operation of its plant. This minimum number was one more than specified in the Nichols bid. The cost of this additional man in the Morse Boulger bid was calculated over a period of twenty years. Likewise the minimum requirement for electric power was stated. The power estimated by Morse Boulger was materially less than the same item in the Nichols bid. The vice-president of Morse Boulger admitted he made a mistake in that item, and that evaluation with respect thereto was proper.

The evaluation of the bids, however, was on the basis of the figures submitted, and resulted in a difference against the Morse Boulger bid as to labor of $96,000 and in its favor on power of $44,100, or a net difference in favor of the Nichols bid of $50,900, resulting in the dollar cost of the Nichols bid being $34,000 less than the dollar cost of the Morse Boulger bid. This evaluation was arrived at by as-

certaining the present worth of the difference between the labor and power costs of the two bids on the basis of a twenty-year period, the term of the bond issue, as the equivalent of issuing additional bonds for those amounts. It finds support in this recommendation in a booklet submitted by Morse Boulger with its bid:

" * * * For purposes of financing, the cost of the plant should normally be written off in 15 to 25 years and the annual finance charge should be considered a part of the cost of disposal by incineration. The plant having the lowest annual cost for financing, operation, and maintenance, over the selected finance period, represents the best value. * * * "

Appellants earnestly argue that whether the incinerator be built by the one or the other by the same specifications the operating cost would necessarily be the same. However, in the process of evaluation the attention of the vice-president of Morse Boulger was specifically directed to its requirement of this extra man. He replied that it was based on his experience and was definitely necessary. He was then advised it would enter into the evaluation. Later when the bids were discussed before the Board he asserted that this additional man was recommended as a precaution against absenteeism and like contingencies. However, it had a direct bearing on the penalty clause above quoted from, which provided that the penalty should be based on the difference between the guaranteed and the actual operating cost. One of his expert witnesses said this additional man was only a safeguard against the penalty clause "in case he was charged with labor as this clause requires over and beyond his guaranteed minimum of men."

We think the County Board had the clear right to consider the bids in the light of the operational cost as well as of the installation costs in ascertaining which bid best served the interests of the county, and that the method of evaluation used to that end was proper.

That was not all, as the evidence shows, that led to accepting the Nichols proposal. Other elements considered material by the Board were the time and experience factors in-

volved as between the Nichols and Morse Boulger bids. The Morse Boulger proposal was to complete the work in 18 months, while Nichols agreed to do it in one year. At the time of considering the bids Nichols had over a period of several years installed and had in successful operation a number of mechanically-stoked incinerators comparable in size to that proposed for Arlington county. The Morse Boulger stoker had been developed much more recently and at that time it had in operation only two small plants, one of which had been in operation for only a few months and the other for a matter of weeks. There was evidence that the burning rate of those two incinerators was only about half of that desired for Arlington. One member of the Board testified that perhaps the most persuasive factor with him in accepting the Nichols bid came from his own investigation of the operation of the two Morse Boulger installations.

3. The trial court found as a fact that there was no fraud shown. Since the evidence furnishes ample basis for that conclusion we are not at liberty to hold otherwise, even if we entertained a different view, which we do not. We have said too many times to cite cases about it that fraud must be established by clear and convincing evidence. Here no fraud or improper motive is charged against the members of the Board or the county manager or the county sanitary engineer. The complaint is that Klegerman, the consulting engineer, was guilty of actual, or at least constructive, fraud in giving false information and advice and in making unwarranted recommendations to the Board, causing its members to be misled. It is sufficient to say that the evidence fails to support that charge. It is shown that Klegerman had no dealings with the Board except indirectly through the county manager and the sanitary engineer. It is shown that both these officials made independent investigations of the facts and both recommended the acceptance of the Nichols bid. Not only so, but the four members of the Board who voted to accept the Nichols bid testified they made their own investigations and they gave clear and convincing reasons for their action. In fact, their evidence in-

dicated unusual care, investigation and study of the problem. In addition to appearing in person before the Board at the September 11 meeting, the vice-president of Morse Boulger, prior to the September 17 meeting, delivered to each member of the Board a brochure containing a statement of additional information he desired the Board to consider, together with data about his company's work and pictures and drawings of its equipment. He testified that he had been given full opportunity to present his case to the Board and that if there was any material fact in relation to the whole matter that was not known to the Board when it awarded the contract to Nichols, he could not think of it. As the trial court observed, even if Klegerman intended to mislead, the Board in fact was not misled by him.

4. The claim that the Nichols bid did not comply with the specifications is without substance. Its details are set out in the second amended petition and taken from the testimony of the two engineers who testified for the appellants. The claim relates to differences between the specifications and the drawings accompanying the Nichols bid. Klegerman analyzed these claimed discrepancies and demonstrated that they were either non-existent or minor in character.

"Generally, before a variation from the specifications will be deemed to destroy the competitive character of a bid for a public contract, the variation must be substantial, that is, it must affect the amount of bid. It is sufficient if the bid conforms substantially to the advertisement." 43 Am. Jur., Public Works and Contracts, sec. 40, p. 781. See also, *Pascoe* v. *Barlum*, 247 Mich. 343, 225 N. W. 506, 65 A. L. R. 833 and note at p. 835.

Also, the specifications specifically provided that acceptance of a bid did not constitute approval of the drawings submitted with the proposal, but that after the award working drawings must be submitted for approval complying with the intent of the specification and contract plans.

5. During the discussion of the bids at the meeting of the Board on September 17, and before it was

voted to accept the Nichols bid, a member of the Board stated he had discussed with the county sanitary engineer the possibility of the county doing some of the outside work connected with the construction of the plant, and the vice-president of the Nichols company present agreed that one or more of those items could be withdrawn. The county manager then stated that the contract should be awarded and on its execution such items as could be done by the county force at a substantial saving could be negotiated with the contractor. There is no evidence that this occurrence in any way influenced the action of the Board. The Board member who made the suggestion testified that he then stated that the full contract should be awarded as it was bid on; that this was done and he did not understand there was any condition, limitation or restriction imposed on the award to Nichols; that any work done by the county would have to be by agreement after the contract was signed. In the original petition this incident was not relied on as ground for nullifying the award, but it was referred to with the statement that Morse Boulger would willingly agree that the county do this outside work if the contract was awarded to it. It being shown that the awarding of the contract was not conditioned upon or influenced by this incident, the acceptance of the Nichols bid should not be disturbed on that account.

Counsel for the appellees argue in their brief that the appellants brought the wrong kind of suit and that the writ of mandamus is not an available remedy for the redress of their stated grievances. They say the attention of the trial court was invited to this contention, but that, in fact, "nobody involved in the case wanted it to be decided on that ground." They assign no cross-error on the point and it is neither necessary nor proper that we express any opinion about it. The case was presented and developed on its merits under the pleadings filed, without objection, and objection now comes too late. *Volenti non fit injuria.*

The judgment of the court below is

*Affirmed.*